# IN THE COURT OF APPEALS OF IOWA

No. 21-0488
Filed June 16, 2021


**IN THE INTEREST OF E.P.,**
**Minor Child,**

**J.L., Mother**
    Appellant

**M.P., Father,**
    Appellant.

_____


Appeal from the Iowa District Court for Polk County, Rachel E. Seymour, District Associate Judge.

The mother and father separately appeal the termination of their parental rights.  **AFFIRMED ON BOTH APPEALS.**


Lori M. Holm, Des Moines, for appellant mother.

David V. Newkirk of Cunningham and Kelso, P.L.L.C., Urbandale, for appellant father.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant Attorney General, for appellee State.

Jamie J. Hagemeier of Drake Legal Clinic, Des Moines, attorney and guardian ad litem for minor child.


Considered by Vaitheswaran, P.J. and Greer and Schumacher, JJ.

**GREER, Judge.**

The mother and father separately appeal the termination of their parental rights to their child, born in 2018. The juvenile court terminated parental rights pursuant to Iowa Code section 232.116(1)(h) (2020).[1] The parents both concede the first three elements of section 232.116(1)(h) were met, but the mother claims the State failed to prove the child could not be returned to her custody at the time of the termination hearing. The mother and father also claim the juvenile court should have applied a permissive statutory exception to termination, arguing termination is detrimental to the child due to the closeness of the parent-child relationships. *See* Iowa Code § 232.116(3)(c).

**I. Facts and Earlier Proceedings.**

This young family[2] came to the attention of the Iowa Department of Human Services (DHS) in early December 2018, after DHS was alerted of a physical altercation between the mother and father in the presence of their then nine-month-old child. When a family member tried to intervene, the father grabbed a firearm, chased the family member out of the apartment, and fired two shots in the air. The

---

[1] Section 232.116(1)(h) provides that the juvenile court may terminate parental rights if it finds all of the following:
>    (1) The child is three years of age or younger.
>    (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
>    (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
>    (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

[2] At the time of the child's birth, the father was fourteen years old and the mother was eighteen.

police arrived at the apartment soon after and found marijuana packaged to sell and a firearm in the child's crib. Both parents admitted they were under the influence of non-prescribed Xanax during the altercation. The parents were arrested and a no-contact order was entered between them, as well as between the mother and child.

During the Child Protective Services assessment the mother begrudgingly admitted to domestic violence and marijuana use in the home. The father acknowledged domestic violence issues, but he denied selling drugs. He also admitted he and the mother had already violated the no-contact order. DHS was working with the family on an informal basis until February 2019, at which point the child was removed at the State's request. The juvenile court granted continued removal following an uncontested hearing. The juvenile court knew the family through the father's ongoing delinquency case; at the time of the removal hearing there was a warrant out for his arrest after he absconded from a court-ordered placement.

In April 2019, the child was adjudicated a child in need of assistance pursuant to Iowa Code section 232.2(6)(c)(2) and (n) (2019). The father's warrant remained active and he did not attend the hearing. However, the mother was present at the hearing. Her criminal case stemming from the December 2018 incident had been resolved; she was granted a deferred judgment, placed on probation for one year, and ordered to complete substance-abuse treatment. The no-contact order between the mother and child had also been modified to allow her contact with the child at DHS discretion. The juvenile court confirmed out-of-

home placement but anticipated the child would return to the mother's custody once she complied with court-ordered services.

By the time of the dispositional hearing in May 2019, the father had been apprehended and placed at a State training facility. Both parents attended the hearing. The mother had yet to schedule a substance-abuse evaluation, but she was close to securing an apartment and was seeking new employment. The juvenile court continued out-of-home placement for the child. The next review hearing took place in August. The father remained at the training facility and had been provided visitation with the child. The mother still needed to participate in the SafeCare curriculum, child-parent psychotherapy, and an early access program. The juvenile court confirmed out-of-home placement but directed DHS to transition the child back to the mother's custody. The court anticipated the child could be returned by November 2019, and it ordered overnight or weekend visits to commence by October.

Fast forward to October, and the State moved to modify visitation and cancel the planned return of the child. The mother had committed multiple probation violations since the last hearing[3] and received a five-day jail sentence as a result. DHS also detailed concerning behavior during a visit with the child where the mother was falling asleep and difficult to understand. In addition, the mother had moved in with her cousin, who previously admitted to DHS that she regularly used marijuana. It was reported that numerous unknown people came

---

[3] The mother tested positive for marijuana, regularly missed meetings with her probation officer, moved without notifying her probation officer, and was not paying her court fees.

and went from the mother's new apartment, despite the fact that she was not allowed to have the child around unapproved persons.

A review hearing on the State's motion was held later that month. The father remained at the training facility. The juvenile court did not return the child to the mother as previously directed; as she needed to complete substance-abuse treatment and purge her contempt sentencing for her probation violations. The juvenile court confirmed out-of-home placement but ordered the child be returned to the mother's custody in December 2019. In December, the State again moved to cancel the return after learning the mother had been arrested for another probation violation and was facing a potential forty-five day contempt sentence. The mother also reported to her probation officer that she was cited for driving without a license after she agreed to pick up a friend who was "high on mushrooms." The mother's probation officer told DHS that the child was in the car when she was arrested and it was reported "a male" came to pick up the child.[4] Following the November incident, the DHS worker asked the mother to put on a drug patch. She initially complied before claiming the patch accidentally got scratched off the next day. The DHS worker directed the mother to get a new patch, but she failed to do so. The juvenile court granted the motion to cancel the planned return of the child to the mother.

A permanency hearing was held in January 2020. The mother was serving her sentence for the probation violations, and the father remained incarcerated. However, the juvenile court granted the mother a six-month extension, finding a

---

[4] The mother claimed the male was her brother, but it was never confirmed.

return was still possible if the mother complied with the terms of her probation, addressed mental health, domestic violence, substance abuse, and unstable housing issues, and worked on building a support system. The juvenile court noted it had anticipated a return to the mother's custody in November and December, but her decisions prevented reunification. The guardian ad litem (GAL) hoped reunification could occur within three to four months. The juvenile court confirmed out-of-home placement and directed the mother to participate in services to address these issues.

The next review hearing took place in April, three months into the six-month extension. The father was in jail, now facing charges of first-degree murder and first-degree robbery. The mother had obtained housing and employment, but the juvenile court was concerned that she still used marijuana sporadically and was inconsistent in attending mental-health therapy and visits with the child. Because the child's guardian indicated they could no longer care for the child, the juvenile court was faced with a difficult proposition: place the child in a foster home while the mother continued to work toward reunification or return the child to the mother prematurely. Ultimately, the juvenile court determined it was in the child's best interest to transition to the mother's care. The juvenile court required the mother to be open and honest with all providers, keep all professionals informed of any changes, and not allow unapproved individuals around the child.[5] The child returned to the mother's care in April.[6]

---

[5] This included the father of the mother's then unborn child, who is a different individual than the father of the child at issue.

[6] We note the order following the hearing did not specifically indicate when the child was returned to the mother. According to DHS, the transition plan remained

In late July, the State moved to modify the dispositional order and remove the child from the mother's custody. The mother tested positive for cocaine that month, and the State argued ongoing substance-abuse and mental-health concerns made it unsafe for the child to remain in her care. The mother resisted, but the juvenile court granted the motion pending an August permanency hearing. At the permanency hearing, it was reported that the mother was still struggling with substance abuse and was allowing unapproved persons around the child, including a new paramour with a domestic abuse conviction. The juvenile court granted the State's motion and confirmed placement of the child in foster care but directed DHS to explore placement with relatives or other suitable persons.

In October, the final permanency review hearing took place. DHS and the child's GAL changed their recommendations to termination of the mother's and father's parental rights. The father remained in jail awaiting trial on serious criminal charges. Thus, he could not participate in any services while jailed, and the disposition of his criminal case was unpredictable. The mother had not engaged in any services since the July hearing. The parents resisted, but the juvenile court found the child could not be returned to either parent at that time. The State filed a termination petition as to both parents in November, and a trial was held in January 2021. At the conclusion of the hearing, the juvenile court terminated both parents' parental rights pursuant to section 232.116(1)(h). They each appeal.

---

in place with the mother receiving increased visitation until the child was placed in her custody on May 3, 2020. The parents argued the return date was April 16, even though the child was only participating in normal visitation and overnight visits. To create a clear record, the juvenile court determined the child was returned to the mother's custody on April 16, 2020.

**II. Standard of Review and Error Preservation.**

We review termination-of-parental-rights proceedings de novo. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). Our primary consideration is the best interest of the child. *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006). The State concedes error was preserved as to the mother. We find the father preserved error by resisting termination at trial.

**III. Analysis.**

We review termination of parental rights using a three-step analysis. *P.L.*, 778 N.W.2d at 39. First, the court must determine whether a ground for termination under Iowa Code section 232.116(1) has been established. *Id.* Next, if the ground for termination is established, the court must then apply the best-interest framework set out in Iowa Code section 232.116(2). *Id.* Third and finally, if the best-interest framework supports termination of parental rights, the court must consider if permissive statutory exceptions in Iowa Code section 232.116(3) weigh against the termination of parental rights. *Id.*

**A. Statutory grounds for termination.**

With Iowa Code section 232.116(1)(h) as a guidepost, the mother and father urge the child could be returned to the mother. The father concedes he is in no position to take over caretaking given his criminal conduct, but follows the mother's lead about her availability. We start with the mother's claims.

The evidence demonstrates that the juvenile court was extremely patient and supportive of the mother's efforts to regain custody of the child. On three different occasions, the juvenile court attempted to return the child to the mother, but each time reunification could not be accomplished due to her poor decision

making and lack of follow through with DHS offered services. She did not remain consistently drug free, testing positive for marijuana multiple times. She committed multiple probation violations that resulted in jail time, thus impeding her ability to care for the child. Against the DHS directive, she consistently allowed unauthorized individuals around the child. Even after these failed attempts at reunification, the juvenile court granted a six-month extension and returned the child to the mother in the spring of 2020. But after the mother tested positive for cocaine three months later, the child was removed, and, by the end of these proceedings, the mother had ceased attending any of the offered services. A parent's poor decisions without regard for the impact on their children is evidence supporting termination of parental rights. *In re M.W.*, 876 N.W.2d 212, 223 (Iowa 2016). We find the State proved by clear and convincing evidence that the child could not be returned to her custody. And "[i]t is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *P.L.*, 778 N.W.2d at 41. Thus, we find termination of the mother's parental rights is in the child's best interest.

Turning to the father, the child has been removed from his care for over two years due to his incarceration, either at the training facility or in jail. He remained incarcerated at the time of the termination hearing, awaiting trial on first-degree murder and first-degree robbery. And, he acknowledges he is "unable to have custody of the child due to his extended incarceration." Even if he were released, he would still need to address his own substance and domestic violence issues.

The crux of his argument on appeal is that the child could be returned to the mother's care. But "our review requires that we view the elements under the lens of the parent's individual skillset and relationship with the child." *In re R.E.*, No. 21-0301, 2021 WL 2137666, at *2 (Iowa Ct. App. May 26, 2021). The father cannot "piggy-back" on the mother's efforts to parent the child and regain custody. *In re C.T.*, No. 18-2199, 2019 WL 1055897, at *1 n.1 (Iowa Ct. App. Mar. 6, 2019) (referencing cases rejecting challenges to termination of parental rights based solely on the assertion that the child could be returned to the other parent). And we have already found the State proved the child could not be returned to the mother's custody. So, we next examine if a permissive exception applies to avoid termination.

**B. Statutory exception to termination.**

Both parents point to the permissive exception to termination found in Iowa Code section 232.116(3)(c), which applies when "[t]here is clear and convincing evidence that the termination would be detrimental due to the closeness of the parent-child relationship." They argue the parental bonds are strong. Here, we have discretion, "based on the unique circumstances of each case and the best interests of the child, whether to apply the factors in this section to save the parent-child relationship." *In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014) (citation omitted). We recognize the mother and child love each other and that she resumed custody for a three-month period in the spring of 2020. But the child was again removed from her care due to her poor decision-making and refusal to engage in the necessary services offered. A lack of permanency for the child for over two years mitigates against extending time for these parents. *See In re M.W.*, 876 N.W.2d

212, 225 (Iowa 2016) (noting that after removal for almost two years, the juvenile court properly declined to apply permissive exception). We decline to apply the permissive exception in section 232.116(3)(c) to save the mother's parental rights. As to the father, he makes no showing of any sort of bond with the child, and we cannot see how a close relationship could exist given his incarceration for the majority of the child's life. We decline to apply the exception to him as well.

**IV. Conclusion.**

We find the State proved a ground for termination as to both parents under section 232.116(1)(h) by clear and convincing evidence. Termination of the mother and father's parental rights is in the best interest of the child, and no statutory exceptions to termination apply. Thus, we affirm termination of the mother's and father's parental rights.

**AFFIRMED ON BOTH APPEALS.**